# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| PHILIP STOECKINGER, | Case No.: 2:18-cv-02054-APG-BNW |
| Plaintiff | **Order on Motions for Summary Judgment** |
| v. | [ECF Nos. 19, 20] |
| CITY OF LAS VEGAS, | |
| Defendant | |

Plaintiff Philip Stoeckinger sues his former employer, the City of Las Vegas (City), for age and disability discrimination under the Age Discrimination in Employment Act of 1967 (ADEA) and the Americans with Disabilities Act of 1990 (ADA). Stoeckinger alleges that the City terminated him and replaced him with a younger employee. He alleges his replacement was given a higher starting salary despite having less experience than him. Stoeckinger also alleges that his employer created and tolerated an environment of age bias in his office. And he alleges that the City's justification for his termination, that he had represented to the City that he intended to retire, is not a legitimate, non-discriminatory reason for his termination. In addition, Stoeckinger alleges that the City terminated him because they perceived him as disabled.

Both parties move for summary judgment. Stoeckinger stipulates to dismissing his ADA claim with prejudice. Accordingly, I grant the City's motion as to Stoeckinger's disability discrimination claim. I deny the parties' motions for summary judgment on the ADEA claim because genuine issues of fact remain as to whether the City's actions in terminating Stoeckinger constituted age discrimination.

/ / / /

/ / / /

## I. BACKGROUND

### A. Stoeckinger's Employment and Qualifications

Stoeckinger began his employment with the City in August 2010. ECF No. 20-1 at 6. At the time he was hired, he had a master's degree in public administration, was a certified public accountant, and had roughly 18 years of experience working for local government entities. *Id.* at 10-12. The director of Human Resources (HR), Dan Tarwater, confirmed that Stoeckinger was an excellent performer. *Id.* at 44. Stoeckinger received an annual performance rating of 94% in 2014 and 96% in 2015. *Id.* at 20, 29. In July 2017, he received a 97% rating in his appraisal. ECF No. 20-2 at 27. He held several different positions with the City, eventually being promoted in April 2016 to Deputy Economic and Urban Development Officer. ECF No. 20-1 at 31. That promotion increased his base salary to $133,405.22. *Id.* at 32.

### B. Pre-retirement Discussions and Stoeckinger's Separation with the City.

The City has a voluntary separation policy that requires an employee to submit a written letter of resignation and give at least two weeks' notice to his or her supervisor. *Id.* at 95. The City also has a pre-retirement program that brings in experts in Nevada Public Employees' Retirement System (PERS), deferred compensation plan, and social security, as well as counselors from UNLV, to help employees plan for retirement. *Id.* at 54. The program is intended to be educational only. *Id.* at 56. Stoeckinger participated in pre-retirement meetings and conversations.

On May 26, 2016, Stoeckinger sent an email to Tarwater, Vince Zamora (the deputy director of HR), and William Arent (Stoeckinger's supervisor and the director of Economic and Urban Development (EUD)), summarizing his understanding of the goals of the pre-retirement meetings and stating that he was looking to retire between late spring and the fall of 2017. ECF

No. 19-2 at 2-3. Zamora replied, explaining that the two goals of the pre-retirement meetings are: (1) to advise employees that the City has identified over 800 employees who are eligible to retire without penalty within the next five years so it would like to, without pressuring anyone, seek information on retirement dates and barriers that may delay a desired retirement date; and (2) advise employees that HR will be playing a larger role in providing information, services, and resources to assist employees during the retirement process. *Id.* at 2.

Stoeckinger stated that in early June 2016, he met with Tarwater and Arent about retirement and whether Stoeckinger was willing to stay on longer, and Tarwater advised Arent to speak with the city manager, who at that time was Betsy Fretwell. ECF No. 20-2 at 10. Stoeckinger communicated with Fretwell throughout the summer of 2016 about his retirement and potentially consulting or staying on based on his financial expertise. *Id.* When he met with Fretwell in September 2016 to discuss his retirement, she "suggested a severance of $40,000, plus one-two years of COBRA insurance ($14,000-28,000) if [Stoeckinger] consulted part-time for a minimum of 1-2 years at $25,000 per year." *Id.* He agreed to this arrangement and spoke with Tarwater about the severance offer. *Id.*

On November 8, 2016, Stoeckinger and Fretwell exchanged emails and Fretwell asked him if he gave Tarwater a retirement date of June 2017. *Id.* at 11. The next day, Stoeckinger emailed Fretwell a summary of his pre-retirement discussion with Arent and HR. ECF No. 19-3 at 2. He noted that he had a couple of part-time opportunities available to him, that he was willing to stay on to assist, and that he asked Fretwell to consider a severance package that "would make it financially worth staying to assist EUD." *Id.*

Tarwater stated in his deposition that in November 2016, during a city retreat, Fretwell pulled him and Stoeckinger aside to discuss looking into a separation package and consulting

agreement for Stoeckinger. ECF No. 20-1 at 82. She asked Tarwater to look into past severance packages and to meet with her at a later date. *Id.* He also stated that shortly after Christmas, Fretwell called him and asked what he had shared with Stoeckinger. *Id.* at 83. He informed her that he relayed past programs to Stoeckinger, such as a $40,000 cash incentive or $30,000 cash and 12-month COBRA extension. *Id.* at 82-84.

On January 17, 2017, Arent sent an email to his staff stating that Stoeckinger was planning on retiring midyear 2017 and that the city manager's office had allowed EUD to dual fill the deputy director position. ECF No. 19-4 at 3. He introduced Jason Thompson as the dual fill position and thanked Stoeckinger "for his support of this transition and the dual fill of the Deputy Director position." *Id.* Stoeckinger replied to Arent via email, stating, "[t]o be clear I have complied with the pre-retirement discussions and program with an estimated time-frame, but I have not committed to any date at this time." *Id.* at 2.

The next day, Fretwell sent a memorandum about the creation of the dual fill policy. ECF No. 19-5 at 2. In that email she noted that the City "is facing a massive retirement migration" and that allowing a pool of critical positions to be dual filled will help with operations and ensure a smooth transition. *Id.*

Stoeckinger met with Arent and Tarwater on April 10, 2017, and again with Arent the next day, to discuss his concerns regarding the need for health insurance and that he would need a severance package to commit to retiring. ECF No. 20-2 at 11-12. On April 12, Stoeckinger sent Arent an email, stating, "[a]t yesterday's meeting you asked me to provide an approx. time of my retirement. I've attached the draft memo we discussed yesterday and outlined below, the potential costs or savings associated with a separation that I am respectfully requesting." ECF No. 19-6 at 2. The memo stated that he was waiting to confirm his earliest retirement date, he

4

has an underlying insurance need due to health-related issues with multiple immediate family members, and also summarized his understanding of conversations about his retirement, the void in finance expertise at EUD without him, and his request for a severance package. ECF No. 20-2 at 18. Arent emailed Tarwater this information and Tarwater replied that the severance request should go directly to the city manager for consideration. ECF No. 19-7 at 2.

On April 24, Stoeckinger met with Tarwater, Arent, and Scott Adams (then deputy city manager). ECF No. 20-2 at 20. According to Stoeckinger's meeting notes, Adams said he was handling the separation request that Arent submitted to the city manager and asked Stoeckinger when he was retiring. *Id.* Stoeckinger said he had not yet provided a resignation letter because of health insurance concerns that were key to his considering retirement. *Id.* Adams told Stoeckinger that he had "put the City in a spot by not giving a resignation letter." *Id.* Adams said he would talk with Fretwell about the severance package and get back to Stoeckinger. *Id.*

About two months later, Stoeckinger sent Fretwell an email stating that he was awaiting her decision regarding his separation agreement. ECF No. 19-8 at 3. Fretwell replied, "I don't have a separation agreement and haven't seen one. I was told you were retiring in the fall. That's the last word I got and that you would be eligible for the standard separation package as an executive based on your service, thus no separation agreement would be necessary." *Id.* She also stated that her last day was approaching and that Scott Adams would be replacing her as city manager, so he would have to take over and consider Stoeckinger's request. *Id.* Stoeckinger replied that they have had ongoing conversations for over a year and that he had complied with everything the City asked of him. *Id.* at 2.

On July 19, Karen Duddlesten, the chief community services officer in the city manager's office, emailed Arent stating that Stoeckinger had verbally stated he planned to retire during the

third quarter and based on that commitment, a dual fill was authorized. ECF No. 19-9 at 3. She also stated, "I am not approving consideration of a separation package. If it would help an orderly transition, I would be glad to meet with the two of you to explain my decision." *Id.* Finally, she stated, "I do not intend to approve the funding for a dual fill passed [sic] October 1, 2018. As a new deputy department head has been appointed, please finalize either a retirement date or end of employment date for Mr. Stoedckinger [sic] prior to that date." *Id.*

On August 10, Arent sent Stoeckinger an email informing him that Adams did not support his severance request. ECF No. 20-2 at 31. Stoeckinger responded by sending a memo stating, "I plan on continuing working at the City and do not plan on retiring. This is virtually entirely the result of underlying insurance needs due to health related issues with multiple immediate family members which I have spoken with you about." *Id.* at 32-33. He went on to say, "I believe a commitment by the former City Manager was made in representations in emails and conversations that she intended to give me a package. . . . I also believe that my request was consistent with deals that have been previously approved by the former and have recently been approved by the current City Manager. Thank you for forwarding me the information from Karen that this should not present any issues as my current (dual fill) position is funded through October 2018." *Id.* at 33.

Arent responded by email to Stoeckinger, and copied Duddlesten, stating, "As we have discussed, I understand that the separation date of September 11 is the date on which you have targeted given your eligibility for PERS without penalty. I have been advised that funding for the dual fill Deputy Director position will be ending on October 1, 2017. Jason will continue in the remaining Deputy Director position following October 1." ECF No. 20-2 at 36.

On September 5, Arent emailed Stoeckinger, asking him to resend the April 12 memo. *Id.* at 38-39. Based on this request, Stoeckinger believed the City was going to reconsider its decision not to provide him with a severance package. *Id.* at 110. The next day, Duddlesten sent a follow up email to Arent alerting him that a date in her initial email was incorrect and that the funding would terminate in October 2017, not 2018. ECF No. 19-9 at 2. Arent emailed Stoeckinger the information Duddlesten provided him. *Id.* He also wrote, "I am speaking with HR and the City Manager's Office (Karen) about health care options given your circumstances." *Id.*

On September 25, Arent emailed Stoeckinger that he expected Stoeckinger's last day to be October 2. ECF No. 20-2 at 43. Stoeckinger forwarded the email to Tarwater. *Id.* Tarwater then forwarded Stoeckinger's email to Zamora and another employee telling them to expect paperwork to support Stoeckinger's separation and that he expected Stoeckinger to file a claim. *Id.*

Stoeckinger's last day was on October 2, 2017. *Id.* at 46. He wrote a letter stating, "I am here to be separated against my will as I have not resigned and have not given up my position. I have been discharged." *Id.* at 46. The City maintains that Stoeckinger was administratively separated from the City. *Id.* at 48. A claims specialist sent an email on October 12 regarding Stoeckinger's separation stating, "I haven't seen an administrative separation before. Would this be a lack of work situation?" *Id* at 50.

When Stoeckinger left his employment with the City, he was 53 years old. *Id.* at 52.

**B. Jason Thompson's Qualifications**

Jason Thompson began working for the City on January 30, 2017 as the first dual fill position recipient. ECF No. 20-1 at 221. At the time he was hired, he had a master's degree in

business administration and roughly 13 years of real estate finance and development experience. *Id.* at 231-32. He had no government experience. Thompson was 45 years old and his starting salary was $135,000.06. *Id.* at 248.

### C. Stoeckinger's Other Evidence of Discrimination

Stoeckinger asserts that Fretwell and Adams frequently used the term "silver tsunami" to refer to older employees retiring. ECF No. 20 at 7. Tarwater acknowledges that Fretwell referred to the concern about many older employees retiring as a "silver tsunami" and he told her she did not have to use that term because some employees construed it as negative. ECF No. 20-1 at 55. Stoeckinger also contends that after a meeting with Adams in which he told Adams he did not have a specific retirement date, Adams made comments about "old farts" and the "silver tsunami" to justify hiring Thompson. ECF No. 20 at 7; ECF No. 20-2 at 110.

Stoeckinger also asserts that an unknown person put a cartoon of "three blind mice" on his door, with his name over the mouse running into the wall. ECF No. 20 at 7. A copy of the picture shows the names Eric, Scott A., and Phil over the three mice. ECF No. 20-2 at 55. The picture had been put up twice, once for about a year and a half. ECF No. 20-1 at 193, 196. Stoeckinger complained to Arent and Tarwater about the picture both times it was put up. *Id.* at 194-97. Stoeckinger believes the picture references his age-related health issues. *Id.* at 197-98. Arent understood the picture to be an inside joke about a specific work project Stoeckinger was running. ECF No. 20-2 at 89.

Stoeckinger asserts that an unknown person put a hard hat on his desk a couple of times, and on separate occasions, someone put oranges on his desk. ECF No. 20 at 8. He believes that the hard hat references a time he had asthma and passed out during a meeting and that the oranges reference the Godfather trilogy where oranges symbolize the death of Marlon Brando's

8

character. *Id.*; ECF No. 20-1 at 199-201. He complained about these incidents to Tarwater. ECF No. 20-1 at 79-80.

## II. SUMMARY JUDGMENT

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000); *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

## III. Age Discrimination in Employment Act of 1967

Under the ADEA, an employer cannot discharge an employee because of the individual's age. 29 U.S.C. § 623(a)(1). This prohibition is "limited to individuals who are at least 40 years of age." *Shelley v. Geren*, 666 F.3d 599, 606-07 (9th Cir. 2012) (citing 29 U.S.C. § 631(a)). "When challenging an adverse employment action under the ADEA, an employee may proceed

under two theories of liability: disparate treatment or disparate impact." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291 (9th Cir. 2000).

To prevail on a disparate treatment claim for age discrimination, a plaintiff "must prove at trial that age was the 'but-for' cause of the employer's adverse action." *Shelley*, 666 F.3d at 607 (citing *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 176 (2009)). Disparate treatment ADEA claims can be based on circumstantial or direct evidence of discrimination. Claims that are based on circumstantial evidence use the three-stage burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Shelley*, 666 F.3d at 608. Under the *McDonnell Douglas* framework, "the employee must first establish a prima facie case of age discrimination." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). To establish a prima facie case, the employee must demonstrate that he was "(1) [a] member[] of the protected class (at least age 40); (2) performing [his] job[] satisfactorily; (3) discharged; and (4) replaced by [a] substantially younger employee[] with equal or inferior qualifications" or discharged under circumstances "giving rise to an inference of age discrimination." *Coleman*, 232 F.3d at 1281.

"If the employee has justified a presumption of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action." *Diaz*, 521 F.3d at 1207. "If the employer satisfies its burden, the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination." *Id.* "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

Claims that are based on direct evidence, however, are not assessed using the *McDonnell Douglas* burden-shifting framework. *France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015), *as amended on reh'g* (Oct. 14, 2015). Direct evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Id.* (citation and emphasis omitted). The evidence "must be directly tied to the employment decision" to defeat summary judgment. *Id.* When a plaintiff presents some thin direct evidence and some circumstantial evidence, "it is most appropriate to consider the propriety of summary judgment under the *McDonnell Douglas* framework." *Id.*

The City argues that even if everything described by Stoeckinger is taken as true, Stoeckinger has failed to demonstrate that age was the but-for cause of his separation from the City because he had been communicating for over a year that he intended to retire. The City argues that the silver tsunami is an industry term and, regardless, that term and the term old farts are stray terms and are not sufficient to prove he was discriminated against because of his age.[1] The City also argues that Stoeckinger does not know who put the picture, oranges, or hard hat on his desk and he cannot show that they were related to the City's decision to separate him from employment, so they do not merit consideration as evidence of discrimination.

As for articulating a legitimate, non-discriminatory reason for Stoeckinger's separation, the City argues Stoeckinger represented to it that he was going to retire by the fall of 2017, and so it acted accordingly based on that representation. It argues that it retained Thompson instead

---

[1] The City disputes whether Adams ever directed the term old farts at Stoeckinger.

11

of Stoeckinger to avoid harm to its recruiting efforts, which was a proper business decision and not discriminatory.

Stoeckinger argues he provided direct evidence of age discrimination to warrant summary judgment in his favor. He argues that Fretwell used the term silver tsunami and allowed Stoeckinger to participate in the pre-retirement program, making promises about a severance package she never intended to provide, to force him out of his employment. He argues that Adams made remarks about old farts and the silver tsunami to justify hiring Thompson. He argues that being replaced by a younger employee, with less experience and a higher starting salary, before Stoeckinger ever confirmed a retirement date, is direct evidence of discrimination. He also argues that the three blind mice picture, hard hat, and oranges, and the City's lack of response to these incidents, reflect an age bias in the office. And he argues that the City's decision to terminate him, and not Thompson, despite both being at-will employees, is evidence of discrimination.

Alternatively, Stoeckinger argues that he has satisfied the *McDonnell Douglas* test because he has shown that: (1) he is at least 40 years old; (2) he performed his job satisfactorily; (3) he was discharged; and (4) he was replaced by a substantially younger employee with inferior qualifications. And he argues that the City cannot articulate a legitimate, non-discriminatory reason for his termination because it inconsistently characterized his termination, first as a reduction in force, then as an agreed-upon separation and retirement, and finally settled on an administrative separation. These inconsistencies, Stoeckinger argues, makes the City's justification unworthy of credence. And Stoeckinger argues that the City's reason is itself evidence of discrimination because, given that all employees will eventually retire, it would open the door to allowing employers to target employees of retirement age before they formally retire.

12

**A. Direct vs Circumstantial Evidence**

I first must decide whether Stoeckinger has presented direct evidence of discrimination. The three blind mice photo, hard hat, and oranges are at most circumstantial. There are no factual allegations supporting the conclusion that Fretwell, Adams, Arent, or anyone involved in the decision-making process knew about, contributed to, or approved of putting the items on Stoeckinger's desk and door for the purpose of referencing his age. There is evidence to suggest the photo was placed on Stoeckinger's door for a long period of time before he took it down or complained, and that it may be representative of a team project rather than anything related to Stoeckinger's age or health issues. However, Stoeckinger complained to Arent and HR about these incidents and no action was taken. These facts, while not particularly strong, could provide circumstantial evidence that the City tolerated an environment of age bias. That Thompson had less experience than Stoeckinger and was hired at a higher salary is also circumstantial evidence of age discrimination.

However, Fretwell and Adam's statements about being concerned about a silver tsunami and referring to older employees as old farts may be more than just stray remarks. *See France*, 795 F.3d at 1173 (finding statements that employer preferred "young, dynamic agents" go beyond a stray remark, but standing alone would be thin support to create a genuine dispute). Because Stoeckinger has presented some direct evidence and some circumstantial evidence, I will apply the *McDonnell Douglas* three-part test.

**B. *McDonnell Douglas* Test**

I must first determine whether Stoeckinger has met his burden to establish a prima case of age discrimination. The first three prongs are met because Stoeckinger was over 40 years old, performed his job satisfactorily, and was discharged. However, at the time he was discharged,

13

Stoeckinger was 53 years old and his replacement, Thompson, was 45. The Ninth Circuit has held that an 8-year age gap is presumptively insufficient to satisfy the fourth prong. *Diaz*, 795 F.3d at 1174 (holding that an average age difference of 10 years or more will be presumptively substantial, but an age difference of less than 10 years will be presumptively insubstantial). Accordingly, the difference in age between Stoeckinger and Thompson is presumptively insubstantial.

In *Diaz*, the plaintiff rebutted the presumption that the age difference was insubstantial by producing evidence that his employer considered his age to be significant. *Id.* (employer expressed a preference for promoting younger agents and had repeated retirement discussions with plaintiff). Here, Stoeckinger has established a prima facie case of age discrimination by showing that the City considered age to be significant when making its decision to retain Thompson and separate Stoeckinger. The City was concerned about a "silver tsunami" and so it established pre-retirement meetings. These meetings were intended for older employees. Viewing the facts in the light most favorable to Stoeckinger, a reasonable jury could find that, while presented as educational only, the City used Stoeckinger's representations during these meetings to determine that he would be retiring in the fall of 2017 despite him never providing an official resignation letter. And the City chose to continue employing Thompson, who was younger than Stoeckinger, after the dual fill position funding ended, even though Thompson had no government experience and less experience overall. The City also paid Thompson more than it paid Stoeckinger. A reasonable jury could find that Stoeckinger's age played a significant role in the City's decision.

The City contends that it decided to administratively separate Stoeckinger because it believed that he was going to retire in the fall of 2017. It also contends it could not afford to risk

14

harming future recruiting efforts by separating Thompson instead of Stoeckinger. The City has presented a legitimate, non-discriminatory reason for separating Stoeckinger, that is, its concern over the recruitment and retainment of its employees during an increased risk of high turnover due to retirement.

The burden then shifts to Stoeckinger to raise a genuine dispute of material fact as to pretext to avoid summary judgment. *Diaz*, 794 F.3d at 1175. Stoeckinger may demonstrate pretext in either of two ways: "(1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011). "When the plaintiff has some direct evidence but also must rely on circumstantial evidence to show pretext, [I] treat direct and circumstantial evidence alike and [I] consider both types of evidence cumulatively." *France*, 795 F.3d at 1175 (internal citations omitted).

A reasonable jury could find that the City's proffered explanation is unworthy of credence. The City created the pre-retirement program to determine when employees were thinking about retiring. The City then hired Thompson for the dual fill position in January 2017 after speaking with Stoeckinger about his plans to retire. Despite not having government experience and having less overall experience than Stoeckinger, Thompson was paid more than Stoeckinger. As early as April 2017, the City was aware that Stoeckinger had not yet formally resigned and was awaiting a decision about his severance package. The City then denied Stoeckinger's severance package and gave him notice of his last day despite Stoeckinger stating that he was not going to retire. City manager Fretwell, and then Adams, also used terms that could be considered derogatory, such as silver tsunami and old farts. And Stoeckinger

15

represented that the City tolerated a culture of age bias by allowing its employees to make fun of Stoeckinger's age and health related issues through the three blind mice picture the oranges, and the hardhat. A reasonable jury could find that Stoeckinger met his burden in proving that age was the but-for cause of his separation because the City required older employees to participate in pre-retirement discussions, used those discussions to determine a retirement date for Stoeckinger even though he indicated he had not set a retirement date, used derogatory terms about people of retirement age, separated Stoeckinger without a formal resignation letter, and retained a younger, less experienced employee at a higher salary.

Alternatively, a reasonable jury could find that the City's decision to separate Stoeckinger was a legitimate business decision untainted by age discrimination. Stoeckinger was an at-will employee. He made representations that he wanted to retire in 2017 because he had other lucrative opportunities available to him. Based on these representations and the fact that Stoeckinger's position was considered critical, the City dual filled his position to ensure a smooth transition. Ultimately, when Stoeckinger changed his mind about retiring, the City was put in the difficult position of letting go a new recruit or separating an employee who had already represented that he intended to leave. To avoid harm to future recruitment efforts, the City retained Thompson. Consequently, it is up to the fact finder to determine whether the City discriminated against Stoeckinger because of his age.

## III. CONCLUSION

I THEREFORE ORDER that defendant City of Las Vegas's motion for summary judgment **(ECF No. 19)** is **GRANTED in part**. Stoeckinger's ADA disability discrimination claim is dismissed with prejudice. The remainder of the City's motion is **DENIED**.

I FURTHER ORDER that plaintiff Philip Stoeckinger's motion for partial summary judgment **(ECF No. 20)** is **DENIED.**

DATED this 20th day of March, 2020.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE